IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FINTIV, INC., a Delaware Corporation, ) | Case No.: _____ |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | |
| ) | **JURY TRIAL DEMANDED** |
| APPLE INC., a California Corporation, ) | |
| ) | |
| *Defendant*. ) | |
| ) | |

## COMPLAINT

Plaintiff Fintiv, Inc. ("Plaintiff" or "Fintiv"), for its complaint against Defendant Apple Inc. ("Defendant" or "Apple"), alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.     This is a case of corporate theft and racketeering of monumental proportions.  It arises out of Apple's misappropriation of Fintiv's proprietary mobile wallet technology ("Fintiv's mobile wallet technology" and/or "Fintiv's trade secrets") that Apple unlawfully used to develop its Apple Pay secure mobile payment product and continues to exploit whenever it installs Apple Pay onto its iPhones, iPads, MacBooks and Apple Watches.

2.     Prior to the launch of Apple Pay, Apple faced slowing smartphone sales, decelerating earnings, growing competition, and criticisms over a perceived lack of innovation.  In 2013, softening demand for the iPhone caused a nearly one

third drop in Apple's share price.  In 2014, Apple continued to face softening iPhone sales and growing investor scrutiny.  That April, to tamp down investor concerns, Apple increased its dividend, authorized stock buybacks, and approved a 7-for-1 stock split.

3.      Despite these efforts, Apple's share price continued to falter.  With fierce competition eating into its market share and squeezing its margins, and with investors and customers alike questioning its ability to innovate, Apple grew increasingly desperate to develop new functionality that would jump start sales of Apple hardware.  Seeking to capitalize on exploding demand for contactless payment functionality, Google, PayPal, and Square, among others, were all trying to make inroads developing mobile digital wallets.  Apple recognized that offering a best-in-class mobile digital wallet on its devices could serve as a supercharged catalyst to accelerate revenue growth and broader user adoption.

4.      Under intense pressure to develop a mobile digital wallet, Apple knew it lacked the time and ingenuity to develop the technology on its own.  With its back against the wall, Apple decided, in what has become its pattern and practice, to steal Fintiv's mobile wallet technology and trade secrets.  Fintiv's intellectual property was painstakingly developed by SK C&C USA, Inc. d/b/a CorFire ("CorFire"), a Delaware Corporation headquartered in Alpharetta, Georgia, which Fintiv acquired in 2014.  In stark contrast to Apple, which stole what it had not developed, CorFire

spent years and tens of millions of dollars researching and developing secure element technology, mobile wallet technology, and related know-how.  Prior to Apple Pay's launch, CorFire sought and obtained patents covering elements of these technologies, while maintaining other elements as trade secrets.

5.    Given its tremendous economic value, CorFire undertook extensive measures to safeguard its proprietary mobile wallet technology and related trade secrets from unauthorized disclosure or discovery.  These efforts included, but were not limited to, restricting access to the source code and technical documentation on a need-to-know basis.  These protective measures, and others like them, were designed and enforced to ensure that Corfire's mobile wallet technology, trade secrets, and integration methods remained confidential and competitively valuable.

6.    With access to CorFire's mobile wallet technology and trade secrets protected behind fortress walls, Apple rolled up a Trojan Horse.  Apple convinced CorFire that it wanted to partner with it to develop its proprietary mobile wallet technology into a worldwide mobile payment business.  Over the course of 2011 and 2012, Apple representatives, under the guise of seeking to do a mobile payment business partnership with CorFire, had numerous meetings with CorFire employees at which the parties had detailed technical discussions regarding CorFire's implementation of its mobile wallet solutions and included information that CorFire uploaded onto an Apple maintained share site.

7.    At these meetings, Apple learned the proprietary details concerning CorFire's secure element and mobile wallet capabilities.  The meetings were subject to Non-Disclosure Agreements ("NDAs") between the parties, and CorFire's intellectual property was identified as confidential proprietary information and a trade secret.

8.    However, once Apple obtained access to and learned Fintiv's trade secrets, Apple discarded any pretense of partnering with CorFire.  Rather than working collaboratively with CorFire to develop the mobile payment business – as Apple had convinced CorFire was its goal – Apple exploited the access it had fraudulently gained by stealing Fintiv's proprietary mobile wallet technology and related trade secrets.  With the help of two CorFire employees it had hired away, who were knowledgeable about CorFire's proprietary mobile wallet technologies, and who had attended in-person meetings with Apple in 2011 and 2012, Apple used Fintiv's mobile wallet technology and trade secrets to launch Apple Pay in the United States in October 2014, and to later roll it out in dozens of other countries, all the while falsely touting it as its own creation.

9.    This is an egregious case of trade secret theft and racketeering.  Apple fraudulently induced CorFire to enter an NDA enabling Apple to gain access to CorFire's mobile wallet technology and trade secrets.  Apple then unlawfully exploited that access by incorporating into Apple Pay features previously found only

in CorFire's proprietary secure element and mobile wallet technologies that were protected as confidential trade secrets. Apple wrongfully induced CorFire to enter NDAs to disclose Fintiv's proprietary mobile wallet technology to Apple under the false pretense that Apple intended to partner with CorFire and then used that proprietary technology to develop and roll out Apple Pay.

10. Upon launch, Apple touted Apple Pay as a revolutionary mobile payment and digital wallet service that allowed users to make contactless purchases using their Apple devices, thus eliminating the need to carry physical credit or debit cards because users were now able to store their credit card and payment information securely on their Apple devices in the Wallet Application. By publicly and repeatedly falsely claiming that Apple Pay is its own creation, Apple diminishes Fintiv's reputation and commercial standing and conceals from the marketplace its theft from Fintiv.

11. Apple initially offered Apple Pay on the then newest iteration of its iPhone and iPad, but later repackaged Fintiv's mobile wallet technology and trade secrets by incorporating Apple Pay for use on its Apple Watch and MacBook. Over the past decade, the scale of Apple's unlawful conduct has been staggering. By incorporating Apple Pay for use on four separate categories of its devices, Apple has repeated and compounded its theft by knowingly utilizing Fintiv's stolen technology

in hundreds of millions of iPhones, iPads, Apple Watches and MacBooks it has sold worldwide.

12.    Apple also knew that Apple Pay was a potential money-making machine of epic scale.  For the first time, Apple had a direct conduit, in the form of Apple Pay, to connect Apple's hundreds of millions of iPhone, iPad, Apple Watch, and MacBook users to credit card issuers, like JP Morgan Chase and Bank of America, and payment processing networks, like Visa and Mastercard.  Apple knew these market giants would be all too happy to let Apple get its cut in exchange for their chance to process the billions of credit card transactions Apple Pay would enable.

13.    Thus, to convert Fintiv's stolen technology and trade secrets into cash, Apple set up a "fence."  It did so by entering a series of interconnected relationships and alliances with credit card issuers, including JP Morgan, Bank of America, CITI, Capital One, and Wells Fargo (who comprise about 75% of the U.S. credit card market), and payment processing networks, including Visa, Mastercard and American Express (who service most of the U.S. payment processing volume).  Over the past decade, this association of leviathans, comprised of Apple and the world's largest credit card issuers and payment processors, has extended its reach into a vast global network that handles billions of Apple Pay transactions annually, processes

trillions in payments, and generates tens of billions in fees for Apple and its confederates every year.

14.    Apple, major credit card issuers, major payment processing networks, and others have formed this informal association and enterprise with the explicit purpose of processing contactless payment transactions in interstate and foreign commerce through Apple Pay for fees ("Apple Pay Payment Enterprise" or "Enterprise").  By doing so, the Enterprise helps Apple convert Fintiv's stolen technology into cash.  Moreover, by associating with Apple to gain access to Apple Pay transaction volume, Apple and the other participants in the Apple Pay Payment Enterprise enter a mutually beneficial business relationship.  Apple controls and enables access to the servicing of the billions of Apple Pay transactions and the trillions in payments, and Apple and the other Apple Pay Payment Enterprise participants generate tens and tens of billions each year servicing them.  Every day, day in and day out, this global Apple Pay money-making association Apple has assembled converts Fintiv's stolen property into washed revenue dollars that flow to Apple's and the other Enterprise members' balance sheets.

15.    Apple participates in the Enterprise's affairs through a pattern of racketeering activity by knowingly devising and conducting a scheme to convert Fintiv's stolen mobile wallet technology and trade secrets into cash for itself and other Enterprise members.  Apple Pay is the engine that drives it all.  Without the

on-going benefit of Fintiv's stolen mobile wallet technology and trade secrets, which Apple has installed (and continues to install) onto hundreds of millions of iPhones, iPads, MacBooks and Apple Watches, the ability of the Apple Pay Payment Enterprise participants to generate billions in fees utilizing Apple Pay would be severely compromised.

16.    This ongoing Enterprise necessarily promotes the success of each of its members: Apple needs the credit card issuing banks and payment processing networks to process the Apple Pay transactions so it can continue to convert Fintiv's stolen intellectual property into cash.  The major banks and payment processing networks, in turn, need Apple to provide access to the Apple Pay transactions to generate the massive revenue streams they earn each year.

17.    Indeed, access to the Apple Pay transactions and the trillions of payment dollars generated is incredibly lucrative for the Enterprise participants. Among other potential fees, the credit card issuing banks typically earn an interchange fee of 1-2% of the transaction amount, the payment processing networks typically earn a network assessment fee of 0.10-0.15% of the transaction amount, and Apple is believed to earn a 0.15% fee for every transaction.

18.    Apple knows its ability to continue to enjoy its ill-gotten spoils the Enterprise generates depends on the market's perception that its intellectual property, such as Apple Pay, is its own technology and not someone else's.  Further,

if Apple's investors, regulators and other market participants understood that Apple misappropriated Fintiv's valuable intellectual property when developing Apple Pay, and that it has continued to do so for the past decade, its ability to profit off its fraud would be severely compromised. Indeed, other of the key Enterprise participants, in their business codes of ethics, identify as a core business value the criticality of not knowingly exploiting the intellectual property of others.

19. For example, in Visa's Code of Business Conduct and Ethics, it expressly notes the importance of protecting the IP rights of others:

> We must also respect the IP rights of others. We take care not to infringe patents, trademarks or other rights. IP is a critical component of our business and the business of others. We respect others' IP just as we expect them to respect ours.

20. Capital One's Code of Conduct expressly calls out as an unethical business practice the exact thing that Apple has done here:

> In my work with an outside technology vendor, I have access to competitively sensitive information about how the vendor's product works. I am aware that we have an internal technology team that is building a similar product or might build a similar product in the future for Capital One's use. Can I share the vendor's competitively sensitive information with the internal team because we all work for Capital One?
>
> No. This type of competitively sensitive information is considered to be competitive intelligence and is proprietary, confidential, and valuable to the third-party vendor. It should not be shared or distributed beyond those on your team with a "need to know" and should only

*be shared per the terms of the confidentiality clause(s)
included in the agreement with the vendor. Furthermore,
any information learned from an outside vendor, whether
technical in nature or not, may be controlled by the
agreement with the vendor and should not be shared
broadly.*

21.     Thus, as part of its scheme, Apple, to mask its underlying theft of
Fintiv's mobile wallet technology and trade secrets and knowing key Enterprise
members might refuse to service Apple Pay transactions if Apple's theft of Fintiv's
stolen intellectual property was revealed, fraudulently advances the false narrative
that it is the developer of Apple Pay.

22.     As recently as October 2024, on Apple Pay's tenth anniversary, Apple
took a public victory lap whereby it again falsely claimed to the marketplace, among
other things, that Apple "envisioned" the concept of Apple Pay and "leverage[d]"
Apple's own "hardware and software" in its creation.  In addition, in October 2024,
an Apple Senior Executive, speaking on a podcast about the origin of Apple Pay,
falsely stated that Apple Pay was Apple's "design" and a product of its "design
goals" and "architectures" from the "formation stage."

23.     On that same podcast, Apple explained it actively collaborated with
Enterprise members Visa, Mastercard, and American Express to ensure that, once
Apple Pay launched, it would be compatible with their payment processing
networks.  Enterprise members who were major credit card issuers, such as JP
Morgan Chase, also collaborated with Apple during Apple Pay's development to

create, what JP Morgan Chase's Chairman and CEO Jamie Dimon described as "a better, faster, and safer" credit card payment system. Thus, while Apple was collaborating with Apple Pay Payment Enterprise Members, such as Visa and JP Morgan Chase, on Apple Pay's development, it was also busy misappropriating Fintiv's intellectual property and using it to develop Apple Pay's mobile wallet.

24.    Moreover, Apple's theft of Fintiv's technology is part of a pattern and practice that Apple has engaged in for years: falsely pretending it wants to "partner" with companies in order to steal confidential and proprietary information under the guise of a working relationship, and thereafter hiring away key employees, all in order to steal the company's valuable intellectual property and use it to commercialize the business on its own. Thus, in the years leading up to 2020, Apple engaged in a similar pernicious scheme to steal trade secrets from Masimo Corp. ("Masimo"), which had developed non-invasive technology related to blood oxygen monitoring that Apple believed was key to overcoming performance issues with its Apple Watch. As with Fintiv, Apple hired away key Masimo employees, including its chief medical officer, who became vice president of Apple's health technology efforts, and used Masimo's own employees to file patents covering the identical technology. Again, as with Fintiv, Apple's scheme was to lure Masimo in with false promises of a partnership to develop and commercialize a blockbuster product based on Masimo's trade secret technology, only to steal that technology with the help of

former Masimo employees and go on to develop and market the product on its own, making hundreds of billions of dollars in the process. As Masimo's founder grimly told *The Wall Street Journal*, when Apple takes an interest in your company's technology, "it's the kiss of death."

25.     Apple perpetrated a similar scheme against a biotech company named Valencell Inc. ("Valencell"), with whom it entered discussions and negotiations under the guise of seeking to license Valencell's active heart-monitoring technology. In reliance on Apple's promise of a licensing partnership, Valencell went so far as to provide Apple with a prototype of its proprietary watch, including a back-facing heart-rate sensor. As with Fintiv and Masimo, Apple solicited and obtained highly sensitive technical and proprietary trade secret information and know-how under the false pretense of a licensing partnership, despite having no real intention of ever actually entering into that licensing agreement. Apple's scheme was – as with Fintiv and Masimo – not to partner or license with Valencell, but to steal Valencell's technology and incorporate it into Apple's own products, which Apple then marketed and sold on its own without paying a nickel to Valencell.

26.     Likewise, Apple never obtained a license for the use of Fintiv's trade secret and proprietary mobile wallet technology but has realized and continues to realize billions of dollars in value and revenues from Apple Pay. Apple has also benefited from goodwill and increased market share in the mobile payment space.

Apple has received these benefits while avoiding the time and resources that Fintiv's predecessor, CorFire, had to invest to conceptualize, model, develop, test, and refine its secure element and mobile wallet technologies.

27.     In 2010, when Apple entered the NDA with CorFire and gained access to Fintiv's trade secrets, Apple's market capitalization was around $295.89 billion. Since then, Apple's mobile wallet technology has helped Apple's market capitalization explode to around $3 trillion dollars, a meteoric rise fueled by Apple's integration into its devices Fintiv's trade secrets. The theft and use of Fintiv's mobile wallet technology has also helped Apple's annual revenue to grow from $199.80 billion in 2014 to $391 billion by 2024. All the while, Apple has not paid a single penny to Fintiv.

28.     Fintiv bring claims for damages under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"); the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-1, et seq. ("Georgia RICO"); the Defend Trade Secrets Act ("DTSA"), 28 U.S.C. § 1836; and the Georgia Trade Secrets Act of 1990 ("GTSA"), O.C.G.A. § 10-1-760, et seq.

## PARTIES

29.     Plaintiff Fintiv is a Delaware corporation having a principal place of business at 801 Barton Springs, Austin, Texas 78704.

30.    Defendant Apple is a California corporation with a principal place of business at One Apple Park Way, Cupertino, California 95014.

## JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction over Fintiv's claims under 28 U.S.C. § 1331, 18 U.S.C. § 1964(c), and 18 U.S.C. § 1836(b).  This Court also has subject matter jurisdiction under 18 U.S.C. § 1332 because there is also complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court also has supplemental jurisdiction over Fintiv's state law claims because Fintiv's state law claims arise out of the same case or controversy as its federal law claims, as all claims in this action arise out of a common nucleus of operative facts.

32.    This Court has personal jurisdiction over Apple under O.C.G.A. § 9-10-91 and under 18 U.S.C. § 1965 because Apple transacts substantial business in this District and purposefully directs acts to this District.

33.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (d), as a substantial number of the events giving rise to this action occurred in this District, and under 18 U.S.C. § 1965.

## FACTUAL SUMMARY

**A.    Fintiv's Mobile Payment Business and Technology**

34.    Fintiv, which was formerly known as Mozido, Inc. ("Mozido") prior to 2019, is a multinational mobile commerce and payments solutions company.  Fintiv began as a fast-growing, highly valued startup and grew to be a significant player in the mobile payment space.  Fintiv offers mobile wallet solutions that are capable of a variety of types of transactions, including mobile payments, remittance, bill payment, point-of-sale integration, loyalty rewards, and cloud payments.  Fintiv's cloud-based technology delivers payments and mobile loyalty solutions to companies in retail, financial services, consumer packaged goods and telecom that serve both banked and unbanked consumers worldwide via the mobile phone.

35.    On or about December 17, 2014, Fintiv (then still known as Mozido) acquired a majority ownership stake in CorFire.  At the time of its acquisition, CorFire was a wholly owned subsidiary of SK C&C, a large multinational South Korean conglomerate.  CorFire was an industry-leading mobile commerce company that had developed mobile wallet technology products and services, including CorPay, CorTSM, and CorMarketing (a.k.a. CorMKT).  CorPay was CorFire's mobile wallet platform.  CorTSM was CorFire's trusted service management ("TSM") platform, which provided the ability to provision credit card credentials to a secure element chip on a phone.  CorMarketing was CorFire's mobile marketing service, which provided a way to push offers and marketing messages into the mobile wallet.  CorFire spent years and tens of millions of dollars researching and

developing these products, its secure element and mobile wallet technologies, and related intellectual property and know-how.

36.    Fintiv's acquisition of CorFire, which was completed in September 2015, was driven in large part by CorFire's mobile wallet technology, and CorFire's intellectual property was key to Fintiv's plans for attracting new business.  Through the acquisition, Fintiv gained CorFire's robust technology solutions and valuable relationships with Mobile Network Operators ("MNOs"), which included relationships with six of the top twenty MNOs in the world with a reach of two billion users; expanded its mobile payments platform; and lead the charge in Near Field Communication ("NFC") and cloud-based payments.  CorFire had worked with some of the biggest names in the mobile payment space and had developed successful mobile wallet applications for companies including Dunkin Brands and Dairy Queen.  By acquiring CorFire, Fintiv gained the benefit of these partnerships and technology solutions and increased its prominence in the mobile payment arena.

### B.    Apple's Meetings with CorFire

37.    On information and belief, over the course of 2011 and 2012, Apple convinced CorFire that Apple wanted to partner with it to develop Fintiv's proprietary mobile wallet technology into a worldwide payment business.  Apple representatives, under the guise of seeking to do a mobile payment business partnership with CorFire, had numerous meetings with CorFire employees at which

Apple learned the proprietary details concerning CorFire's secure element and mobile wallet capabilities. CorFire employees met with Apple employees at least six times and discussed CorFire's secure element and mobile wallet technologies, including Fintiv's mobile wallet technology and trade secrets. The meetings were subject to NDAs between the parties, and CorFire's intellectual property was identified as confidential proprietary information and a trade secret.

38.    First, on March 17, 2011, CorFire's Pascal Caillon (Senior Vice President, Europe and Merchant Accounts) and Jeffrey Sanguk Lee (Director, Business and Product Strategy) met with Apple's Benjamin Vigier (Senior Product Manager, Mobile Commerce - Apple Retail) in San Francisco, California.

39.    Second, on July 4, 2011, CorFire's Mr. Caillon met with Apple's Mr. Vigier and Javier Warra (another Apple employee) in San Francisco, California.

40.    Third, on July 25, 2011, CorFire's Mr. Caillon and Apple's Mr. Vigier met again in San Francisco, California.

41.    Fourth, on October 4, 2011, CorFire's Mr. Caillon and Apple's Mr. Vigier met again in San Francisco, California.

42.    Fifth, on January 31, 2012, CorFire employees met with Apple at Apple's then-headquarters, located at 1 Infinite Loop, Cupertino, California 95014. The meeting attendees included CorFire's Mr. Caillon, Jon Squire (CorFire's Chief

Marketing Officer), and George Eubank (CorFire's Vice President of Channel Sales) and multiple Apple employees.

43.     Also present at the January 31, 2012 meeting was a representative of InComm Payments, Inc. ("InComm"), Jeffrey Kiedrowski, who was InComm's Vice President and General Manager, Wireless Services and Mobile Commerce. InComm, based in Atlanta, Georgia, was one of CorFire's major customers. InComm delivered enhanced end-to-end payment platforms and emerging financial technology solutions to help businesses grow across a wide range of industries, including mobile payments, retail, healthcare, tolling & transit, incentives, and financial services.

44.     In 2011, CorFire had teamed up with InComm on a Merchant Partner Program.  As part of this program, CorFire was seeking merchant partners to launch a "Mobile Merchant Wallet" in the United States.  This promotion was only being extended to a limited list of "Tier One" merchants, which included Apple.  The first "Tier One" merchants to sign up would receive substantial incentives to deliver this "Proof of Concept" wallet to their shoppers.   The CorFire-InComm Merchant Partner Program included an initiative involving Apple, culminating in the January 31, 2012 meeting at Apple's headquarters.

45.     During the January 31, 2012 meeting, the CorFire team shared CorFire's confidential and proprietary information related to the design and

processes of CorFire's mobile wallet technology, and made a presentation on CorFire's products and services, including CorPay and its technologies for mobile wallets. Prior to this sharing of information, the parties executed NDAs, as it was CorFire's general and customary practice to do.

46.    Sixth, on November 14, 2012, multiple CorFire employees and multiple Apple employees met at Apple's then-headquarters in Cupertino, California. Prior to the November 14, 2012 meeting, the parties executed a Master Restricted Project Agreement and Confidentiality Agreement, both effective as of November 6, 2012.

47.    CorFire's product and technology team, including Jun Hong, Jaemin Lim and Kevin Zhu, along with others making up CorFire's Senior Leadership, also met with approximately five representatives from Apple's product and technology teams. The agenda was for Apple to understand the Trusted Service Manager, Over the Air ("OTA"), Key Management System for supporting a mobile wallet, or "mWallet." During this meeting, CorFire provided a deep dive into the CorFire technology. The meeting was subject to an NDA.

48.    Rather than continuing to work collaboratively with CorFire to develop the mobile payment business – as Apple had convinced CorFire was its goal – Apple instead stole Fintiv's proprietary mobile wallet technology and launched Apple Pay itself in the United States in October 2014. Apple's theft of Fintiv's technology is part of a pattern and practice that Apple has engaged in for years – falsely pretending

to partner with companies in order to steal confidential and proprietary information under the guise of a working relationship, and thereafter hire away key employees, in order to steal the companies' valuable intellectual property and use it to commercialize the technology for itself.

### C.    Apple's Launch of Apple Pay

49.    On September 9, 2014, Apple first publicly announced Apple Pay, describing it as "a new category of service that will transform mobile payments with an easy, secure and private way to pay."  Apple explained that Apple Pay would work using NFC and secure element technologies, stating: "Apple Pay works with iPhone® 6 and iPhone 6 Plus through a groundbreaking NFC antenna design, a dedicated chip called the Secure Element, and the security and convenience of Touch ID™."

50.    In the September 9, 2014 announcement, Apple also stated: "Starting in October [2014], with iPhone 6 and iPhone 6 Plus, Apple Pay will be available in the US as a free update to iOS 8. Apple Pay will work in stores with iPhone 6, iPhone 6 Plus and Apple Watch. Apple Pay APIs will be available to developers in iOS 8 so they can enable purchasing physical goods within their apps on iPhone 6 and iPhone 6 Plus."

51.    Apple's announcement further stated: "Apple Pay supports credit and debit cards from the three major payment networks, American Express, MasterCard

and Visa, issued by the most popular banks including Bank of America, Capital One Bank, Chase, Citi and Wells Fargo, representing 83 percent of credit card purchase volume in the US. In addition to the 258 Apple retail stores in the US, some of the nation's leading retailers that will support Apple Pay include Bloomingdale's, Disney Store and Walt Disney World Resort, Duane Reade, Macy's, McDonald's, Sephora, Staples, Subway, Walgreens and Whole Foods Market. Apple Watch will also work at the over 220,000 merchant locations across the US that have contactless payment enabled. Apple Pay is also able to make purchases through apps in the App Store$^{SM}$."

52.    On October 16, 2014, Apple announced that Apple Pay would become available in the United States on October 20, 2014, and that Apple's new iPad Air 2 and iPad mini 3 products would support Apple Pay.

53.    Apple launched Apple Pay in the United States on October 20, 2014. On information and belief, at the time of its U.S. launch, Apple Pay utilized, among other things, NFC and secure element technologies, which were imperative to Apple Pay's operation and functionality.

54.    On or about January 8, 2015, Apple reported on the success of Apple Pay since its U.S. launch, stating: "Since its October release, Apple Pay has been a favorite of customers, merchants and app developers. More banks and credit unions continue to add support for Apple Pay, now representing about 90 percent of credit

card purchase volume in the US. Leading merchants including Bloomingdale's, Disney Store, Duane Reade and Walgreens are letting their customers enjoy the ease of use, security and privacy of Apple Pay.  Some of the most popular apps including HotelTonight, OpenTable, Target and Ticketmaster are also enjoying the convenience and privacy of Apple Pay, making it even easier for users to make secure purchases."

55.    Apple began to roll out Apple Pay internationally in 2015, launching it in the United Kingdom, its first market outside the U.S., in July 2015.  Next, in November 2015, Apple launched Apple Pay in Canada and Australia.  By the end of 2017, Apple had released Apple Pay in about 20 countries, including China, France, Russia, and Japan, and in the ensuing years launched Apple Pay in many other countries and regions.  As of today, Apple Pay is available in approximately 80 countries.

56.    Apple first offered Apple Pay on its iPhone and certain of its iPads in 2014.  In 2015, it offered Apple Pay on the Apple Watch, and in 2016 it offered Apple Pay on certain of its MacBooks.  Over the ensuing years, Apple has offered Apple Pay on virtually every new model of its iPhones, iPads, Apple Watches, and MacBooks.  And each of these dozens and dozens of separate and distinct devices utilizes the mobile wallet technology and trade secrets that Apple stole from Fintiv.

57.     Apple has realized and continues to realize billions in value and revenues from Apple Pay.  Apple Pay facilitates over 6 trillion U.S. dollars ($6,000,000,000,000) of transactions annually and generates billions in value and revenues for Apple.  Apple's market capitalization went from around $295.89 billion to around $3 trillion since 2010, when Apple entered the NDA with Fintiv and gained access to Fintiv's trade secrets.  The theft and use of Fintiv's mobile wallet trade secret technology has also caused Apple's annual revenue to grow from $199.8 billion in 2014 to $391 billion by 2024.

### D.     Apple's Hiring of Former CorFire/SK C&C Employees

58.     Apple has hired former employees of CorFire or its corporate affiliates who were involved in and knowledgeable about CorFire's proprietary secure element and mobile wallet technologies, business plans and strategies, and know-how, including Fintiv's mobile wallet technology and trade secrets.

59.     In August 2015, Apple hired Pascal Caillon as its Director of Apple Pay & Wallet Product Management, a position that Mr. Caillon held until March 2022. Before Apple hired him, Mr. Caillon was employed as CorFire's Senior Vice President, Europe and Merchant Accounts, from April 2011 through January 2014, a position in which he "[l]ed strategy and [business development] efforts to establish Corfire's presence in the US and Europe" and "[d]eveloped [CorFire's] mobile wallet app product strategy and offerings[.]"  As indicated above, Mr. Caillon had

attended all of CorFire's in-person meetings with Apple in 2011-2012.  As such, Mr. Caillon came to Apple with detailed knowledge of CorFire's proprietary secure element and mobile wallet technologies, business plans and strategies, and know-how, including Fintiv's mobile wallet technology and trade secrets.  When hired and while employed by Apple, Mr. Caillon still had a duty of confidentiality and nondisclosure concerning Fintiv's mobile wallet technology and trade secrets.

60.    In or about September 2015, Apple hired Jason Miller, an employee of SK C&C (*i.e.*, CorFire's parent company before CorFire was acquired by Fintiv). Before Apple hired Mr. Miller, he was SK C&C's mCommerce Global Product & New Business Development Manager from November 2012 until September 2015, a position in which he was "[i]n charge of product management, new business expansion, and account management for SK C&C Mobile Commerce Division focusing primarily in the Asian and Oceania markets," and his work involved, among other things, "develop[ing] and manag[ing] numerous global accounts/projects focused on mobile wallet solutions including both mobile payments (NFC, QR code, HCE based) and value added services"; "[i]dentify[ing] new partnerships, products, and business models"; "[w]ork[ing] closely with prominent MNOs, banks, and merchants in leading m-Commerce markets like South Korea, Australia, Germany, and India to develop mobile payment and [value-added service] capabilities for end users"; and "review[ing] market changes and

develop[ing] product and future sales roadmap for SK C&C's Mobile Commerce Division[.]"  Mr. Miller also worked with engineers who developed SK C&C's proprietary secure element and mobile payment technologies, and was knowledgeable about these technologies when Apple hired him.  When hired and while employed by Apple, Mr. Miller still had a duty of confidentiality and nondisclosure concerning Fintiv's mobile wallet technology and trade secrets.

### E.  Apple's Misappropriation of Fintiv's Mobile Wallet Technology and Trade Secrets

61.     Apple obtained access to Fintiv's mobile wallet technology and trade secrets under NDAs through meetings with CorFire in 2011-2012.  Apple then incorporated elements of CorFire's proprietary technology, including its NFC-enabled mobile wallet technology, into developing Apple Pay.

62.     Apple has used and incorporated CorFire's confidential and proprietary information in Apple Pay and Apple devices on which Apple Pay is an available feature, including CorFire's information and know-how regarding the secure element, widget, and NFC-enabled mobile wallet technologies.  For example, both CorFire's mobile wallet products and services and Apple Pay include the following elements, all of which were discussed in CorFire's 2012 presentations to Apple: (a) an NFC-enabled mobile wallet application; (b) a secure element; (c) an ability to store payment card information/credentials on the secure element chip; (d) widgets

that represent a physical card and have a user interface; and (e) a trusted service manager.

63.    Under the guise of seeking to do a mobile payment business partnership with CorFire, Apple induced CorFire to disclose Fintiv's mobile wallet technology and trade secrets to Apple by entering into NDAs and meeting with CorFire to discuss CorFire's proprietary technologies under the false pretense that Apple intended to enter into a partnership with CorFire.  On information and belief, unbeknownst to CorFire, Apple had no intent to enter a business partnership with CorFire and used the information Apple gained from those meetings to advance its development of Apple Pay.  Apple never partnered with, nor took a license from, CorFire.  Instead, Apple misappropriated Fintiv's mobile wallet technology and trade secrets to develop and market Apple Pay at CorFire's expense.

64.    On information and belief, when Apple employed Mr. Caillon and Mr. Miller, Apple used their knowledge of Fintiv's mobile wallet technology and trade secrets in further developing Apple Pay and rolling it out to international markets, areas in which Mr. Caillon and Mr. Miller had deep knowledge based on having been exposed to CorFire's proprietary information and know-how.

65.    Apple has commercially exploited Fintiv's mobile wallet technology and trade secrets for Apple's own gain, generating for itself, at Fintiv's loss, billions of dollars in value and revenues.

66.     Apple Pay has over 500 million users, generates billions of annual revenue for Apple, and gives Apple the largest market shares of mobile wallets and mobile wallet transactions.

67.     On October 17, 2024, Apple published a press release on its website touting the tenth anniversary of the release of Apple Pay.  This press release included a statement from Jennifer Bailey, Apple's vice president of Apple Pay and Apple Wallet, in which she claimed that Apple "envisioned" the concept of Apple Pay and "leverage[d]" Apple's own "hardware and software" to develop it:

   a.  "When we started our journey with Apple Pay 10 years ago, we saw a unique opportunity to leverage Apple's hardware and software to make a meaningful impact on the financial health and lives of our customers. From the outset, we envisioned a world where you could use your iPhone to seamlessly pay for everything — from groceries to train tickets, in person and online, across the globe — all while keeping your personal and financial information safe and private."

68.     A week later, on October 22, 2024, Bailey appeared on "The a16z Podcast" in an episode titled "The Story of Apple Pay," where she made the following statements regarding the purported origin and Apple's development of Apple Pay:

   a.  Regarding the start of her involvement in Apple Pay, Bailey stated that

Tim Cook involved her during the "formation stage," in which "there were some engineers working on the core technologies associated with Apple Pay, like the NFC [Near Field Communication technology] and wireless capabilities and the secure elements and the technologies that we [*i.e.*, Apple] were using. And so, really was in the formation stage from a technology standpoint."

b.  In response to a question regarding the "inspiration" behind Apple Pay, Bailey stated that Apple "just felt like payments was an area that had a couple of friction points and things that we could really solve for customers that we thought were really important. And the first was obviously making payments much more secure … these plastic cards have been around for a long time. And we looked at that and said … I think there's some better technology than using plastic cards to do this kind of thing. We thought we could make it easier. We thought we could make it more private for customers. And with the technologies that we had developed, as we looked at the user experience, back then even, I think there was a view that in some number of years everyone should be paying this way."

c.  Bailey also described Apple's purported development and "design" of Apple Pay in collaboration with certain participants in the Apple Pay

Payment Enterprise:

    i. "In the early days and the early design of Apple Pay, we were collaborating with, obviously, internally on the engineering side, but also with the networks — you know, the tokenization schemes that we use on our network base, so Visa, MasterCard, Amex. And then now we work with these domestic networks, as well[;]"

    ii. "[I]t took collaboration and design really across these parties to agree on what was the best technical architecture and the most secure architecture. There are pieces, obviously, on the phone side, things like taking a token, encrypting it, storing that in the secure element, and it can only be released with a biometric[;]" and

    iii. "[O]n the network and bank side, being able to take those tokens, validate the cryptogram, validate and translate the token in a way that the banks could then process the transactions. So, it was collaborative, and we really focused on security first, as you mentioned, with a lot of these technologies that were just in the early stages of coming to life."

d. Bailey went on to claim that Apple Pay was "our," *i.e.*, Apple's,

"design" when describing Apple's purported design plans regarding privacy and data:

    i.  "[On] the privacy side, I remember really some very specific design meetings where we would talk through different architectures about how the transactions could flow, and how they would be de-tokenized or how the cryptogram would be read. And we were very clear and specific in our design goals that we did not want to have that data. We didn't want to be able to see it. We didn't want to be able to aggregate it. It was very clear in our design that when you pay in store today, using Apple Pay, we don't see that transaction. It goes up the traditional payment infrastructure into the network and into the issuers, through the acquirers, etc."

    ii.  "[Privacy] was a very specific design goal of ours, which was to make sure that we weren't, if you will, a honeypot for all of this very sensitive transaction data. So it was really designed from the beginning to be architected that way from a privacy perspective."

**Claims for Relief**

## FIRST CLAIM FOR RELIEF

## (Violations of RICO, 18 U.S.C. § 1962(c))

69.     Fintiv incorporates by reference all of the preceding paragraphs as if fully set forth herein.

70.     At all relevant times, Fintiv is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

71.     At all relevant times, Apple is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

*The RICO Enterprise*

72.     RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

73.     Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

74.     Apple and the other Apple Pay Payment Enterprise members are a group of companies associated together in fact for the common purpose of processing contactless payment transactions in interstate and foreign commerce through Apple Pay for fees.  As described in the foregoing paragraphs of this

Complaint, Apple, because of its on-going theft and exploitation of Fintiv's mobile wallet technology and trade secrets, is able to install Apple Pay on its iPhones, iPads, MacBooks and Apple Watches so that users of Apple Pay-equipped devices can effectuate billions of contactless payment transactions totaling trillions of dollars.

75.     Apple developed Apple Pay through a campaign of theft and fraudulent acts and, for more than a decade, has taken steps to conceal from Fintiv and the marketplace its unlawful conduct.   Apple, major credit card issuers, and major network payment processors have organized their operation into a cohesive group with specific and assigned responsibilities.   Over the years they have adapted to changing circumstances, recruited new members to their operation, and expanding the scope and nature of their activities.   While the organization of the Enterprise has changed over time, and some members may have come and left at different times, the Enterprise has generally been structured to operate as a unit to process contactless payment transactions in interstate and foreign commerce through Apple's unlawful exploitation of Fintiv's mobile wallet technology and trade secrets in Apple Pay.

76.     While each member of the Apple Pay Payment Enterprise participates in the operation of the Enterprise, Apple is its gatekeeper.   Apple enables Apple Pay transactions through its provisioning of Apple Pay onto the devices it sells, and Apple controls access by determining which banks and payment processors can participate in the Enterprise.

77.    Apple and the other Enterprise members constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

78.    At all relevant times, the Apple Pay Payment Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

*Pattern of Racketeering Activity*

79.    Apple violated 18 U.S.C. § 1962(c) by conducting or participating, directly or indirectly, in facilitating or conducting the management, operation, or affairs of the Apple Pay Payment Enterprise through a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), composed of multiple related acts of wire fraud under 18 U.S.C. § 1343, theft of trade secrets under 18 U.S.C. § 1832, and interstate transportation of stolen property under 18 U.S.C. § 2314, as detailed further herein.  The wrongful conduct has been and remains part of the Apple Pay Payment Enterprise's ongoing way of doing business and constitutes a continuing threat to Fintiv's property.  Without Apple's repeated and ongoing predicate acts and without coordination between all members of the Apple Pay Payments Enterprise, Apple's racketeering scheme would not have succeeded and would not pose a threat to Fintiv into the future.

*Pattern of Racketeering Activity:  Multiple Instances of Wire Fraud, in Violation of 18 U.S.C. § 1343*

80.    As set forth herein, Apple made or participated in making, directly or

indirectly, material misrepresentations regarding Apple's development of Apple Pay.

81.    In furtherance of its scheme, and as described herein, Apple transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds to further its fraudulent scheme to monetize Fintiv's stolen intellectual property, including by publishing and promoting in the marketplace the false claim that Apple developed the Apple Pay technology.

82.    Apple's use of the wires to transmit false statements about the development of Apple Pay harms Fintiv's reputation because Fintiv is deprived of the business opportunities that would come from proper recognition in the marketplace about its role in developing and enabling Apple Pay's mobile wallet functionality.    Apple's false statements are also intended to harm Fintiv by concealing from discovery Apple's theft of Fintiv's intellectual property and deprives Fintiv of just compensation for use or exploitation of Fintiv's intellectual property and trade secrets.    Such statements include, but are not limited to, the following:

    a.    On October 17, 2024, Apple published on its website the following statement from Jennifer Bailey, Apple's vice president of Apple Pay and Apple Wallet, in which she falsely claimed that Apple

"envisioned" the concept of Apple Pay and "leverage[d]" Apple's own "hardware and software" to develop it:

  i. "When we started our journey with Apple Pay 10 years ago, we saw a unique opportunity to leverage Apple's hardware and software to make a meaningful impact on the financial health and lives of our customers.  From the outset, we envisioned a world where you could use your iPhone to seamlessly pay for everything — from groceries to train tickets, in person and online, across the globe — all while keeping your personal and financial information safe and private."

b. On October 22, 2024, Bailey appeared on "The a16z Podcast" in an episode titled "The Story of Apple Pay," where she made the following false statements regarding Apple's purported development of Apple Pay:

  i. Regarding the start of her involvement in Apple Pay, Bailey states that Tim Cook involved her during the "formation stage," in which "there were some engineers working on the core technologies associated with Apple Pay, like the NFC [Near Field Communication technology] and wireless capabilities and the secure elements and the technologies that we [*i.e.*, Apple]

were using. And so, really was in the formation stage from a technology standpoint."

ii.  In response to a question regarding the "inspiration" behind Apple Pay, Bailey stated that [Apple] "just felt like payments was an area that had a couple of friction points and things that we could really solve for customers that we thought were really important. And the first was obviously making payments much more secure … these plastic cards have been around for a long time. And we looked at that and said … I think there's some better technology than using plastic cards to do this kind of thing. We thought we could make it easier. We thought we could make it more private for customers. And with the technologies that we had developed, as we looked at the user experience, back then even, I think there was a view that in some number of years everyone should be paying this way."

iii.  Bailey also described Apple's purported development and "design" of Apple Pay in collaboration with certain participants in the Apple Pay Payment Enterprise:

1.  "In the early days and the early design of Apple Pay, we were collaborating with, obviously, internally on the

engineering side, but also with the networks — you know, the tokenization schemes that we use on our network base, so Visa, MasterCard, Amex. And then now we work with these domestic networks, as well[;]"

2. "[I]t took collaboration and design really across these parties to agree on what was the best technical architecture and the most secure architecture. There are pieces, obviously, on the phone side, things like taking a token, encrypting it, storing that in the secure element, and it can only be released with a biometric[;]" and

3. "[O]n the network and bank side, being able to take those tokens, validate the cryptogram, validate and translate the token in a way that the banks could then process the transactions. So it was collaborative and we really focused on security first, as you mentioned, with a lot of these technologies that were just in the early stages of coming to life."

iv. Bailey also stated that Apple Pay was "our," *i.e.*, Apple's, "design" when describing Apple's purported design plans regarding privacy and data:

1. "[On] the privacy side, I remember really some very specific design meetings where we would talk through different architectures about how the transactions could flow, and how they would be de-tokenized or how the cryptogram would be read. And we were very clear and specific in our design goals that we did not want to have that data. We didn't want to be able to see it. We didn't want to be able to aggregate it. It was very clear in our design that when you pay in store today, using Apple Pay, we don't see that transaction. It goes up the traditional payment infrastructure into the network and into the issuers, through the acquirers, etc."

2. "[Privacy] was a very specific design goal of ours, which was to make sure that we weren't, if you will, a honeypot for all of this very sensitive transaction data. So it was really designed from the beginning to be architected that way from a privacy perspective."

83.    These willful, knowing, and intentional acts constitute wire fraud in violation of 18 U.S.C. § 1343.

*Pattern of Racketeering Activity:  Multiple Instances of Trade Secret Theft in Violation of 18 U.S.C. § 1832*

84.    As alleged herein, at various points in time, Apple has knowingly stolen, or without authorization appropriated or taken by fraud, artifice, or deception, Fintiv's trade secrets through unlawful means in violation of 18 U.S.C. § 1832(a)(1).

85.    Specifically, as alleged in this Complaint, Apple stole and unlawfully used Fintiv's proprietary mobile wallet technology to develop its Apple Pay secure mobile payment product.

86.    Further, on information and belief, Apple stole or obtained Fintiv's trade secrets without authorization from at least two Fintiv employees with detailed knowledge of CorFire's proprietary secure element and mobile wallet technologies, business plans and strategies, and know-how, including Fintiv's mobile wallet technology and trade secrets, in violation of the former employees' duties of confidentiality and nondisclosure, after Apple hired them in or about September 2015, to further develop Apple Pay and to launch and expand Apply Pay in international markets, areas in which these former employees had deep knowledge based on having been exposed to CorFire's proprietary information and know-how

87.    As described herein, Apple continues to commit theft by unlawfully using, duplicating, uploading, altering, replicating, transmitting, sending, or conveying Fintiv's mobile wallet technology, without Fintiv's authorization and in violation of 18 U.S.C. §§ 1832(a)(1) and 1832(a)(2), in a variety of products,

including through its installation of Apple Pay in the following products:

    a.  iPhone Models Supporting Apple Pay:

        i.  iPhone 8, released September 22, 2017;

        ii.   iPhone 8 Plus, released September 22, 2017;

        iii.  iPhone X, released November 3, 2017;

        iv.  iPhone XS, released September 21, 2018;

        v.  iPhone XS Max, released September 21, 2018;

        vi.  iPhone XR, released October 26, 2018;

        vii.  iPhone 11, released September 20, 2019;

        viii.  iPhone 11 Pro, released September 20, 2019;

        ix.  iPhone11 Pro Max, released September 20, 2019;

        x.  iPhone SE 2, released April 24, 2020;

        xi.  iPhone 12, released October 23, 2020;

        xii.  iPhone 13, released September 24, 2021;

        xiii.  iPhone SE 3, released March 18, 2022;

        xiv.  iPhone 14, released September 16, 2022;

        xv.  iPhone 15, released September 22, 2022;

        xvi.  iPhone 16, released September 20, 2024; and

        xvii.  iPhone 16e, released February 19, 2025.

    b.  Apple Watch Models Supporting Apple Pay:

        i.  Apple Watch Series 3, released September 12, 2017;

        ii.  Apple Watch Series 4, released September 12, 2018;

        iii.  Apple Watch Series 5, released September 10, 2019;

   iv. Apple Watch SE, released September 15, 2020;

   v. Apple Watch Series 6, released September 15, 2020;

   vi. Apple Watch Series 7, released September 14, 2021;

   vii. Apple Watch Series 8, released September 7, 2022;

   viii. Apple Watch SE 2, released September 7, 2022;

   ix. Apple Watch Ultra, released September 7, 2022;

   x. Apple Watch Series 9, released September 12, 2023;

   xi. Apple Watch Ultra 2, released September 9, 2024; and

   xii. Apple Watch Series 10, released September 9, 2024.

 c. iPad Models Supporting Apple Pay:

   i. iPad 5th Generation, released March 24, 2017;

   ii. iPad Pro 2nd Generation, released June 13, 2017;

   iii. iPad 6th Generation, released March 27, 2018;

   iv. iPad Pro 3rd Generation, released November 7, 2018;

   v. iPad Mini 5th Generation, released March 18, 2019;

   vi. iPad Air 3rd Generation, released March 18, 2019;

   vii. iPad 7th Generation, released September 25, 2019;

   viii. iPad Pro 4th Generation, released March 25, 2020;

   ix. iPad 8th Generation, released September 18, 2020;

   x. iPad Air 4th Generation, released October 23, 2020;

   xi. iPad Pro 5th Generation, released May 21, 2021;

   xii. iPad 9th Generation, released September 24, 2021;

   xiii. iPad Mini 6th Generation, released September 24, 2021;

xiv.  iPad Air 5th Generation, released March 18, 2022;

xv.  iPad 10th Generation, released October 26, 2022;

xvi.  iPad Pro 6th Generation, released October 26, 2022;

xvii.  iPad Air 6th Generation, released May 15, 2024;

xviii.  iPad Pro 7th Generation, released May 15, 2024; and

xix.  iPad Mini 7th Generation, released October 23, 2024.

d.  MacBook Models Supporting Apple Pay, including:

i.  MacBook Air, released October 30, 2018.

e.  Apple Vision Pro, released February 2, 2024.

88.    As described herein, Apple intended and continues to repeatedly convert Fintiv's proprietary mobile wallet technology for its own economic benefit, and to the benefit of other Enterprise members, at the expense of Fintiv.

89.    As described herein, when Apple's device users transact on Apple Pay, Apple and the other Enterprise participants, including the credit card issuing banks and payment processing networks, convert Fintiv's stolen intellectual property into fee revenues for themselves.

*Pattern of Racketeering Activity:   Multiple Instances of Interstate Transportation and Sale of Stolen Property in Violation of 18 U.S.C. § 2314*

90.    As alleged herein, since launching Apple Pay in October 2014, Apple has repeatedly: unlawfully transported or caused to be transported in interstate or foreign commerce; goods, wares, merchandise, securities, or money having a value of $5,000 or more which are stolen, converted or taken by fraud; while knowing the

same to be stolen, converted or taken by fraud.

91.    Specifically, Fintiv's stolen intellectual property, in the form of its mobile wallet technology and trade secrets, is used in Apple Pay which is, itself, a built-in system feature integrated into the core of Apple's iPhone operating system.

92.    Apple's iPhone operating system, which contains Apple Pay and Fintiv's stolen intellectual property, is installed on iPhones during the manufacturing process, before they are shipped to stores or customers.  Thus, every new iPhone that has an iPhone operating system installed that contains Apple Pay also contains Fintiv's stolen intellectual property.

93.    Fintiv's mobile wallet technology and trade secrets, which Apple has used to develop its Apple Pay secure mobile payment product, is a good, ware, or merchandise exceeding $5,000 in value which has been knowingly stolen, converted or taken by fraud by Apple.

94.    Apple unlawfully transports or causes to be transported in interstate or foreign commerce iPhones containing Apple Pay which contains Fintiv's stolen mobile wallet technology and trade secrets.

95.    Since the launch of Apple Pay in October 2024, Apple has assembled iPhones in overseas factories, including at factories in Foxconn, Pegatron, and Zhengzhou, China.  Apple transports or causes to be transported in interstate or foreign commerce millions of iPhones from China to distribution centers in the

United States, including to warehouses in Elk Grove, California and Carlisle, Pennsylvania.  From its distribution centers, Apple then transports or causes to be transported in interstate or foreign commerce iPhones to its stores and other sales channels throughout the United States.

96.     As described herein, Apple knowingly transports or causes to be transported in interstate or foreign commerce iPhones that contain Fintiv's stolen mobile wallet technology and trade secrets.  Indeed, since the launch of Apple Pay in October 2014, Apple has continuously and knowingly transported or caused to be transported in interstate or foreign commerce hundreds of millions of iPhones that contain Fintiv's goods, wares or merchandise which Apple has stolen, converted, or taken by fraud.

97.     Apple has engaged in multiple predicate acts, as described in paragraphs 69 to 97, *supra*.  The conduct of Apple described in paragraphs 79 to 96, *supra*, constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

98.     Fintiv was injured in its business and property by reason of Apple's violations of 18 U.S.C. § 1962(c). The injuries to Fintiv caused by reason of the violations of 18 U.S.C. § 1962(c) include, but are not limited to, the loss of monies owed to Fintiv resulting from Apple's decade long and on-going unlawful exploitation of Fintiv's intellectual property on hundreds of millions of Apple

devices it has sold, damage to Fintiv's reputation and goodwill, and the loss of business opportunities Fintiv suffered resulting from Apple's persistent failure to properly credit Fintiv for its role in creating Apple Pay mobile wallet.

99.    Further, these injuries to Fintiv were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962.  Fintiv is the ultimate victim of Apple's unlawful Enterprise.  Fintiv has been and will continue to be injured in its business and property in an amount to be determined at trial.

100.    Pursuant to 18 U.S.C. § 1964(c), Fintiv is entitled to recover treble damages plus costs and attorneys' fees from Apple.

## SECOND CLAIM FOR RELIEF

### (Violations of Georgia RICO, O.C.G.A. § 16-14-4)

101.    Fintiv incorporates by reference all of the preceding paragraphs as if fully set forth herein.

102.    At all relevant times, Fintiv is a person within the meaning of O.C.G.A. § 16-14-6(b) and O.C.G.A. § 16-14-6(c).

*The RICO Enterprise*

103.   The Georgia RICO defines an enterprise as "any unchartered union, association, or group of individuals associated in fact although not a legal entity[.]" O.C.G.A. § 16-14-3(3).

104.   As described in the preceding paragraphs, Apple and the other Apple Pay Payment Enterprise members are a group of companies associated together in fact for the common purpose of processing contactless payment transactions in interstate and foreign commerce through Apple Pay for fees.  As described in the foregoing paragraphs of this Complaint, Apple, because of its on-going theft and exploitation of Fintiv's mobile wallet technology and trade secrets, is able to install Apple Pay on its iPhones, iPads, MacBooks and Apple Watches so that users of Apple Pay equipped devices can effectuate billions of contactless payment transactions totaling trillions of dollars.

105.   As described in the preceding paragraphs, Apple developed Apple Pay through a campaign of theft and fraudulent acts and, for more than a decade, has taken steps to conceal from Fintiv and the marketplace its unlawful conduct.  Apple, major credit card issuers, and major network payment processors have organized their operation into a cohesive group with specific and assigned responsibilities. Over the years they have adapted to changing circumstances, recruited new members to their operation, and expanded the scope and nature of their activities.  While the

organization of the Enterprise has changed over time, and some members may have come and left at different times, the Enterprise has generally been structured to operate as a unit to process contactless payment transactions in interstate and foreign commerce through Apple's unlawful exploitation of Fintiv's mobile wallet technology and trade secrets.

106.   As described in the preceding paragraphs, while each member of the Apple Pay Payment Enterprise participates in the operation of the Enterprise, Apple is its gatekeeper.  Apple enables Apple Pay transactions through its provisioning of Apple Pay onto the devices it sells, and Apple controls access by determining which banks and payment processors can participate in the Enterprise.

107.   Apple and the other Enterprise members constitute an association-in-fact enterprise within the meaning of O.C.G.A. § 16-14-3(3).

*Pattern of Racketeering Activity*

108.   Apple conducted or participated, directly or indirectly, in the conduct, management, or operation of the Apple Pay Payment Enterprise's affairs through a "pattern of racketeering activity" within the meaning of O.C.G.A. § 16-14-3(4) and in violation of O.C.G.A. § 16-14-4.

*Pattern of Racketeering Activity:  Multiple Instances of Wire Fraud, in Violation of O.C.G.A. §§ 16-14-3(4), 16-14-3(5)(C) and 18 U.S.C. § 1343*

109.   As set forth herein, Apple made or participated in making, directly or indirectly, material misrepresentations regarding Apple's development of Apple

Pay.

110.   As set forth herein, Apple transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds to further its fraudulent scheme to monetize Fintiv's stolen intellectual property, including by publishing and promoting in the marketplace the false claim that Apple developed the Apple Pay technology:

111.   Apple's use of the wires to transmit false statements about the development of Apple Pay harms Fintiv's reputation because it is deprived of the business opportunities that would come from proper recognition in the marketplace about its role in developing and enabling Apple Pay's mobile wallet functionality. Apple's false statements are also intended to harm Fintiv by concealing from discovery Apple's theft of Fintiv's intellectual property and deprive Fintiv of just compensation for use or exploitation of its intellectual property and trade secrets. Such statements include, but are not limited to, the following:

   a.   On October 17, 2024, Apple published on its website the following statement from Jennifer Bailey, Apple's vice president of Apple Pay and Apple Wallet, in which she falsely claimed that Apple "envisioned" the concept of Apple Pay and "leverage[d]" Apple's own "hardware and software" to develop it:

      i.   "When we started our journey with Apple Pay 10 years ago, we

saw a unique opportunity to leverage Apple's hardware and software to make a meaningful impact on the financial health and lives of our customers. From the outset, we envisioned a world where you could use your iPhone to seamlessly pay for everything — from groceries to train tickets, in person and online, across the globe — all while keeping your personal and financial information safe and private."

b.  On October 22, 2024, Bailey appeared on "The a16z Podcast" in an episode titled "The Story of Apple Pay," where she made the following false statements regarding Apple's purported development of Apple Pay:

    i.  Regarding the start of her involvement in Apple Pay, Bailey states that Tim Cook involved her during the "formation stage," in which "there were some engineers working on the core technologies associated with Apple Pay, like the NFC [Near Field Communication technology] and wireless capabilities and the secure elements and the technologies that we [*i.e.*, Apple] were using. And so, really was in the formation stage from a technology standpoint."

    ii.  In response to a question regarding the "inspiration" behind

Apple Pay, Bailey stated that Apple "just felt like payments was an area that had a couple of friction points and things that we could really solve for customers that we thought were really important. And the first was obviously making payments much more secure … these plastic cards have been around for a long time. And we looked at that and said … I think there's some better technology than using plastic cards to do this kind of thing. We thought we could make it easier. We thought we could make it more private for customers. And with the technologies that we had developed, as we looked at the user experience, back then even, I think there was a view that in some number of years everyone should be paying this way."

iii. Bailey also described Apple's purported development and "design" of Apple Pay in collaboration with certain participants in the Apple Pay Payment Enterprise:

1. "In the early days and the early design of Apple Pay, we were collaborating with, obviously, internally on the engineering side, but also with the networks — you know, the tokenization schemes that we use on our network base, so Visa, MasterCard, Amex. And then now we work with

these domestic networks, as well[;]"

2. "[I]t took collaboration and design really across these parties to agree on what was the best technical architecture and the most secure architecture. There are pieces, obviously, on the phone side, things like taking a token, encrypting it, storing that in the secure element, and it can only be released with a biometric[;]" and

3. "[O]n the network and bank side, being able to take those tokens, validate the cryptogram, validate and translate the token in a way that the banks could then process the transactions. So it was collaborative and we really focused on security first, as you mentioned, with a lot of these technologies that were just in the early stages of coming to life."

iv. Bailey also stated that Apple Pay was "our," *i.e.*, Apple's, "design" when describing Apple's purported design plans regarding privacy and data:

1. "[On] the privacy side, I remember really some very specific design meetings where we would talk through different architectures about how the transactions could

flow, and how they would be de-tokenized or how the cryptogram would be read. And we were very clear and specific in our design goals that we did not want to have that data. We didn't want to be able to see it. We didn't want to be able to aggregate it. It was very clear in our design that when you pay in store today, using Apple Pay, we don't see that transaction. It goes up the traditional payment infrastructure into the network and into the issuers, through the acquirers, etc."

2. "[Privacy] was a very specific design goal of ours, which was to make sure that we weren't, if you will, a honeypot for all of this very sensitive transaction data. So it was really designed from the beginning to be architected that way from a privacy perspective."

112.  These willful, knowing, and intentional acts constitute wire fraud in violation of O.C.G.A. §§ 16-14-3(4), 16-14-3(5)(C), and 18 U.S.C. § 1343.

*Pattern of Racketeering Activity:  Multiple Instances of Trade Secret Theft in Violation of O.C.G.A. § 16-8-13 and 18 U.S.C. § 1832*

113.  As alleged herein, at various points in time, Apple has knowingly stolen, or without authorization appropriated or taken by fraud, artifice, or deception, Fintiv's trade secrets through unlawful means in violation of O.C.G.A. § 16-8-13,

specifically enumerated in O.C.G.A. § 16-14-3(5)(A)(xii) as a predicate act of "theft" for purposes of the Georgia Racketeer Influenced and Corrupt Organizations (RICO) Act, and 18 U.S.C. § 1832.

114.   Specifically, as alleged in this Complaint, Apple stole and unlawfully used Fintiv's proprietary mobile wallet technology to develop its Apple Pay secure mobile payment product.

115.   Further, on information and belief, Apple stole or obtained Fintiv's trade secrets without authorization, or acquired knowledge of such trade secrets by deceitful means, from at least two Fintiv employees with detailed knowledge of CorFire's proprietary secure element and mobile wallet technologies, business plans and strategies, and know-how, including Fintiv's mobile wallet technology and trade secrets, in violation of the former employees' duties of confidentiality and nondisclosure, after Apple hired them in or about September 2015, to further develop Apple Pay and to launch and expand Apply Pay in international markets, areas in which these former employees had deep knowledge based on having been exposed to CorFire's proprietary information and know-how.

116.  As described herein, Apple continues to commit theft or misappropriation of trade secrets by unlawfully using, duplicating, uploading, altering, replicating, transmitting, sending, or conveying Fintiv's mobile wallet technology, without Fintiv's authorization and in violation of O.C.G.A. § 16-8-1318

and 18 U.S.C. §§ 1832(a)(1) and 1832(a)(2), in a variety of products, including through its installation of Apple Pay in the following products:

a.  iPhone Models Supporting Apple Pay:

    i.  iPhone 8, released September 22, 2017;

    ii.   iPhone 8 Plus, released September 22, 2017;

    iii.  iPhone X, released November 3, 2017;

    iv.  iPhone XS, released September 21, 2018;

    v.  iPhone XS Max, released September 21, 2018;

    vi.  iPhone XR, released October 26, 2018;

    vii.  iPhone 11, released September 20, 2019;

    viii.  iPhone 11 Pro, released September 20, 2019;

    ix.  iPhone11 Pro Max, released September 20, 2019;

    x.  iPhone SE 2, released April 24, 2020;

    xi.  iPhone 12, released October 23, 2020;

    xii.  iPhone 13, released September 24, 2021;

    xiii.  iPhone SE 3, released March 18, 2022;

    xiv.  iPhone 14, released September 16, 2022;

    xv.  iPhone 15, released September 22, 2022;

    xvi.  iPhone 16, released September 20, 2024; and

    xvii.  iPhone 16e, released February 19, 2025.

b.  Apple Watch Models Supporting Apple Pay:

    i.  Apple Watch Series 3, released September 12, 2017;

    ii.  Apple Watch Series 4, released September 12, 2018;

    iii.  Apple Watch Series 5, released September 10, 2019;

    iv.  Apple Watch SE, released September 15, 2020;

    v.  Apple Watch Series 6, released September 15, 2020;

    vi.  Apple Watch Series 7, released September 14, 2021;

    vii.  Apple Watch Series 8, released September 7, 2022;

    viii.  Apple Watch SE 2, released September 7, 2022;

    ix.  Apple Watch Ultra, released September 7, 2022;

    x.  Apple Watch Series 9, released September 12, 2023;

    xi.  Apple Watch Ultra 2, released September 9, 2024; and

    xii.  Apple Watch Series 10, released September 9, 2024.

c.  iPad Models Supporting Apple Pay:

    i.  iPad 5th Generation, released March 24, 2017;

    ii.  iPad Pro 2nd Generation, released June 13, 2017;

    iii.  iPad 6th Generation, released March 27, 2018;

    iv.  iPad Pro 3rd Generation, released November 7, 2018;

    v.  iPad Mini 5th Generation, released March 18, 2019;

    vi.  iPad Air 3rd Generation, released March 18, 2019;

    vii.  iPad 7th Generation, released September 25, 2019;

    viii.  iPad Pro 4th Generation, released March 25, 2020;

    ix.  iPad 8th Generation, released September 18, 2020;

    x.  iPad Air 4th Generation, released October 23, 2020;

    xi.  iPad Pro 5th Generation, released May 21, 2021;

    xii.  iPad 9th Generation, released September 24, 2021;

xiii.  iPad Mini 6th Generation, released September 24, 2021;

xiv.  iPad Air 5th Generation, released March 18, 2022;

xv.  iPad 10th Generation, released October 26, 2022;

xvi.  iPad Pro 6th Generation, released October 26, 2022;

xvii.  iPad Air 6th Generation, released May 15, 2024;

xviii.  iPad Pro 7th Generation, released May 15, 2024; and

xix.  iPad Mini 7th Generation, released October 23, 2024.

d.  MacBook Models Supporting Apple Pay, including:

i.  MacBook Air, released October 30, 2018.

e.  Apple Vision Pro, released February 2, 2024.

117.  As described herein, Apple intended and continues to repeatedly convert Fintiv's proprietary mobile wallet technology for its own economic benefit, and to the benefit of other Enterprise members, at the expense of Fintiv.

118.  As described herein, when Apple's device users transact on Apple Pay, Apple and the other Enterprise participants, including the credit card issuing banks and payment processing networks, convert Fintiv's stolen intellectual property into fee revenues for themselves.

*Pattern of Racketeering Activity:  Multiple Instances of Theft by Bringing Stolen Property into the State in Violation of O.C.G.A. § 16-8-9*

119.  Apple, beginning in or about October 2014 and proceeding continuously thereafter, in furtherance of and as part of a pattern of racketeering activity, did unlawfully bring, and continues to unlawfully bring, into the State of

Georgia certain property, to wit: hundreds of thousands of iPhones that contain Fintiv's stolen intellectual property, knowing said property was stolen in another state, namely California, in violation of O.C.G.A. § 16-8-9.

120.    Said conduct constitutes "theft by bringing stolen property into the state," a criminal offense under the laws of the State of Georgia, and is an act indictable under Georgia law.  Said offense is specifically enumerated in O.C.G.A. § 16-14-3(5)(A)(xii) as a predicate act of "theft" for purposes of the Georgia Racketeer Influenced and Corrupt Organizations (RICO) Act.

121.    These acts, when considered in conjunction with the other predicate acts alleged herein, form a pattern of racketeering activity under O.C.G.A. § 16-14-3(4), and were committed in furtherance of the Enterprise identified in this action.

122.    Apple has engaged in multiple predicate acts, as described in paragraphs 101 to 122, *supra*.  The conduct of Apple described in paragraphs 108 to 121, *supra*, constitutes a pattern of racketeering activity within the meaning of within the meaning of O.C.G.A. § 16-14-3(4) and in violation of O.C.G.A. § 16-14-4.

123.    Fintiv was injured in its business and property by reason of Apple's violations of O.C.G.A. § 16-14-4.  The injuries to Fintiv caused by reason of the violations of O.C.G.A. § 16-14-4 include, but are not limited to, the loss of monies owed to Fintiv resulting from Apple's decade long and on-going unlawful exploitation of Fintiv's intellectual property on hundreds of millions of Apple

devices it has sold, damage to Fintiv's reputation and goodwill, and the loss of business opportunities Fintiv suffered resulting from Apple's persistent failure to properly credit Fintiv for its role in creating Apple Pay mobile wallet.

124.    Further, these injuries to Fintiv were a direct, proximate, and reasonably foreseeable result of the violation of O.C.G.A. § 16-14-4.  Fintiv is the ultimate victim of Apple's unlawful activity in furtherance of the Enterprise.  Fintiv has been and will continue to be injured in its business and property in an amount to be determined at trial.

125.    Pursuant to O.C.G.A. § 16-14-6(c), Fintiv is entitled to recover treble damages plus costs and attorneys' fees from Apple.

### THIRD CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets in Violation of the

### Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836)

126.    Fintiv re-alleges and incorporates by reference all the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

127.    Fintiv's mobile wallet technology and trade secrets consist of technical designs, implementations, expertise, and know-how relating to the proprietary secure element and NFC-enabled mobile wallet technologies that CorFire conceived of and developed through a significant expenditure of time, effort, and resources. This information was subject to reasonable confidentiality protections and was used

in or intended for use in commerce.  Fintiv's mobile wallet technology and trade secrets include Fintiv's design and know how surrounding how to implement a mobile wallet system that provisions mobile payment information and payment credentials through a TSM platform on a phone and server.  Additionally, the trade secrets include trade secrets of a non-technical nature regarding how to effectively implement such a system.  Fintiv's confidential information constitutes trade secrets under 18 U.S.C. § 1839(3) and is related to products and services used in interstate and foreign commerce.

128.   Fintiv's mobile wallet technology and trade secrets were not public. Fintiv, including its predecessor-in-interest, CorFire, took reasonable measures to maintain the secrecy of its trade secrets and confidential information by, among other things, requiring employees to sign confidentiality and non-disclosure agreements, by restricting access to its trade secrets, and by requiring a password login to access its trade secrets.  Such measures were followed with respect to Fintiv's mobile wallet technology and trade secrets.

129.   Fintiv's mobile wallet technology and trade secrets derive independent economic value from not being generally known to, and not readily ascertainable through proper means by, another person or entity who could obtain economic value from the disclosure or use of the information.

130.   Apple improperly acquired Fintiv's mobile wallet technology and trade secrets under the false pretense of a licensing partnership, despite having no real intention of ever actually entering into that licensing agreement.  Apple's scheme was not to partner or license but to steal CorFire's technology and incorporate it into Apple's own products, which Apple then marketed and sold as its own.

131.   Apple incorporated Fintiv's mobile wallet technology and trade secrets into numerous versions of Apple's iPhone, iPad, Apple Watch and MacBook without authorization by copying, duplicating, sketching, drawing, photographing, downloading, uploading, altering, destroying, photocopying, replicating, transmitting, delivering, sending, mailing, communicating, or conveying such information.

132.   CorFire executed NDAs with Apple that strictly limited Apple's disclosure and use of Fintiv's mobile wallet technology and trade secrets to evaluating it for a potential business venture and related discussions with CorFire, while expressly prohibiting Apple from disclosing or using it for any other purpose or for Apple's own benefit, absent CorFire's express written consent.  CorFire never provided Apple with such consent.

133.   In meetings with Apple in 2011-2012, CorFire disclosed to Apple under the NDAs Fintiv's mobile wallet technology and trade secrets, including CorFire's CorPay deck, for Apple to evaluate for purposes of entering a business venture with

CorFire.  CorFire reasonably relied on the strict limitations on disclosure and use in the NDAs when it met with Apple and disclosed Fintiv's mobile wallet technology and trade secrets.

134.  Apple knew or had reason to know that it acquired Fintiv's mobile wallet technology and trade secrets by improper means, and Apple disclosed and used Fintiv's mobile wallet technology and trade secrets without CorFire's or Fintiv's consent.  In addition, Apple knowingly and intentionally used Fintiv's mobile wallet technology and trade secrets for purposes prohibited by the NDAs in developing and marketing Apple Pay, despite being well-aware of its confidentiality obligations and the restrictions on use and disclosure of Fintiv's mobile wallet technology and trade secrets under the NDAs.  Apple later hired former employees of CorFire or its corporate affiliate who were directly involved in and knowledgeable about CorFire's development, design, implementation, and business plans and strategy for its proprietary secure element and NFC-enabled mobile wallet technologies.  On information and belief, Apple exploited CorFire's former employees' knowledge and expertise in these areas to further develop Apple Pay and facilitate rolling out Apple Pay to international markets.  Apple's wrongful acts are ongoing and include further developing and marketing Apple Pay and related products derived from or based on Fintiv's mobile wallet technology and trade

secrets.  Apple, therefore, has misappropriated Fintiv's mobile wallet technology and trade secrets under the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836).

135.  Apple's misappropriation of Fintiv's mobile wallet technology and trade secrets has injured Fintiv, has caused financial damage to Fintiv, and will continue to injure and cause financial damage to Fintiv unless remedied by this Court.  Fintiv has incurred damages as a direct and proximate result of the misappropriation.

136.  Through its bad faith conduct, Apple has unjustly enriched itself at Fintiv's expense.  On information and belief, Apple has commercially exploited Fintiv's mobile wallet technology and trade secrets for Apple's own gain, generating for itself, at Fintiv's loss, billions of dollars in value and revenues.  On information and belief, Apple Pay has over 500 million users, generates over a billion dollars of annual revenues for Apple, and gives Apple the largest market shares of mobile wallets and mobile wallet transactions.  On information and belief, Apple wrongfully induced CorFire to enter into NDAs and to disclose its mobile wallet technology and trade secrets to Apple under the false pretense that Apple intended to enter into a partnership with CorFire and then used that mobile wallet technology and trade secrets to develop and roll out Apple Pay and to profit therefrom.  Apple benefited from the misappropriation including, for example, by accelerating development, avoiding research and development costs, and gaining market share.  Fintiv,

therefore, is entitled to recover damages from Apple for unjust enrichment or no less than a reasonable royalty.

137.   Apple's misappropriation of Fintiv's mobile wallet technology and trade secrets was willful and malicious.  Based on Apple's contractual agreements to abide by the non-disclosure requirements of the NDAs, Apple has been well-aware of its confidentiality obligations and restrictions on use and disclosure of Fintiv's mobile wallet technology and trade secrets.  Furthermore, Apple continues to use Fintiv's mobile wallet technology and trade secrets, and has made efforts to conceal its misconduct.  Apple's misappropriation was willful and malicious as evidenced by its conduct and for ignoring access controls and for continued use despite its awareness that its products contain Fintiv proprietary information.  Fintiv is therefore entitled to recover double damages for willful and malicious appropriation.

138.   As described more fully herein, by stealing and misappropriating Fintiv's mobile wallet technology and trade secrets to create and launch Apple Pay, Apple has unjustly received the benefit of Fintiv's substantial time and investment in the development of its mobile wallet technology and trade secrets.

139.   Apple has avoided the expense and effort necessary to independently develop a mobile wallet through its scheme.

140.    Apple has also been unjustly enriched by its unearned credibility with new and existing customers, which would have been directed to Fintiv but for Apple's concealment of Fintiv's role in developing Apple Pay.

141.    As described more fully herein, at all times, Apple knew, appreciated, and intended to be enriched by its misconduct and has subsequently accepted and retained all of the benefits generated by its misconduct.

142.    Apple's misconduct and unjust enrichment has no justification in law or fact.

143.    As a direct and proximate result of Apple's wrongful conduct, as described more fully herein, Fintiv has sustained substantial monetary damages, in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets in Violation of the

### Georgia Trade Secrets Act of 1990, O.C.G.A. § 10-1-760, et seq.)

144.    Fintiv re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

145.    Fintiv's mobile wallet technology and trade secrets consist of technical designs, implementations, expertise, and know-how relating to the proprietary secure element and NFC-enabled mobile wallet technologies that CorFire conceived of and developed through a significant expenditure of time, effort, and resources.

Specifically, the trade secret constitutes Fintiv's implementation and know how surrounding how to implement a mobile wallet system that provisions mobile payment information and payment credentials through a TSM platform on a phone and server and well as strategic business information.

146.   Fintiv's mobile wallet technology and trade secrets were not public. Fintiv, including its predecessor-in-interest, CorFire, took reasonable measures to maintain the secrecy of its trade secrets and confidential information by, among other things, requiring employees to sign confidentiality and non-disclosure agreements, by restricting access to its trade secrets, and by requiring a password login to access its trade secrets.  Such measures were followed with respect to Fintiv's mobile wallet technology and trade secrets.

147.   Fintiv's mobile wallet technology and trade secrets derive independent economic value from not being generally known to, and not readily ascertainable through proper means by, another person or entity who could obtain economic value from the disclosure or use of the information.

148.   Apple improperly acquired Fintiv's mobile wallet technology and trade secrets under the false pretense of a licensing partnership, despite having no real intention of ever actually entering into that licensing agreement.  Apple's scheme was not to partner or license but to steal CorFire's technology and incorporate it into Apple's own products, which Apple then marketed and sold as its own.

149.    Apple incorporated Fintiv's mobile wallet technology and trade secrets into numerous versions of Apple's iPhone, iPad, Apple Watch and MacBook without authorization by copying, duplicating, sketching, drawing, photographing, downloading, uploading, altering, destroying, photocopying, replicating, transmitting, delivering, sending, mailing, communicating, or conveying such information.

150.    CorFire executed NDAs with Apple that strictly limited Apple's disclosure and use of Fintiv's mobile wallet technology and trade secrets to evaluating it for a potential business venture and related discussions with CorFire, while expressly prohibiting Apple from disclosing or using it for any other purpose or for Apple's own benefit, absent CorFire's express written consent.  CorFire never provided Apple with such consent.

151.    In meetings with Apple in 2011-2012, CorFire disclosed to Apple under the NDAs Fintiv's mobile wallet technology and trade secrets, including CorFire's CorPay deck, for Apple to evaluate for purposes of entering a business venture with CorFire.  CorFire reasonably relied on the strict limitations on disclosure and use in the NDAs when it met with Apple and disclosed Fintiv's mobile wallet technology and trade secrets.

152.    Apple knew or had reason to know that it acquired Fintiv's mobile wallet technology and trade secrets by improper means, and Apple disclosed and

used Fintiv's mobile wallet technology and trade secrets without CorFire's or Fintiv's consent.  In addition, Apple knowingly and intentionally used Fintiv's mobile wallet technology and trade secrets for purposes prohibited by the NDAs in developing and marketing Apple Pay, despite being well-aware of its confidentiality obligations and the restrictions on use and disclosure of Fintiv's mobile wallet technology and trade secrets under the NDAs.  Apple later hired former employees of CorFire or its corporate affiliate who were directly involved in and knowledgeable about CorFire's development, design, implementation, and business plans and strategy for its proprietary secure element and NFC-enabled mobile wallet technologies.  On information and belief, Apple exploited CorFire's former employees' knowledge and expertise in these areas to further develop Apple Pay and facilitate rolling out Apple Pay to international markets.  Apple's wrongful acts are ongoing and include further developing and marketing Apple Pay and related products derived from or based on Fintiv's mobile wallet technology and trade secrets.  Apple, therefore, has misappropriated Fintiv's mobile wallet technology and trade secrets under the Georgia Trade Secrets Act of 1990 (O.C.G.A. § 10-1-760-767) and common law.

153.  Apple's misappropriation of Fintiv's mobile wallet technology and trade secrets has injured Fintiv, has caused financial damage to Fintiv, and will continue to injure and cause financial damage to Fintiv unless remedied by this

Court.  Fintiv, therefore, is entitled to recover damages from Apple under O.C.G.A. § 10-1-763, and under common law.

154.   Through its bad faith conduct, Apple has unjustly enriched itself at Fintiv's expense.  On information and belief, Apple has commercially exploited Fintiv's mobile wallet technology and trade secrets for Apple's own gain, generating for itself, at Fintiv's loss, billions of dollars in value and revenues.  On information and belief, Apple Pay has over 500 million users, generates over a billion dollars of annual revenues for Apple, and gives Apple the largest market shares of mobile wallets and mobile wallet transactions.  On information and belief, Apple wrongfully induced CorFire to enter into NDAs and to disclose its mobile wallet technology and trade secrets to Apple under the false pretense that Apple intended to enter into a partnership with CorFire and then used that mobile wallet technology and trade secrets to develop and roll out Apple Pay and to profit therefrom.  Fintiv, therefore, is entitled to recover damages from Apple for unjust enrichment under O.C.G.A. § 10-1-763, and under common law.

155.   Apple's misappropriation of Fintiv's mobile wallet technology and trade secrets was willful and malicious.  Based on Apple's contractual agreements to abide by the non-disclosure requirements of the NDAs, Apple has been well-aware of its confidentiality obligations and restrictions on use and disclosure of Fintiv's mobile wallet technology and trade secrets.  Furthermore, Apple continues

to use Fintiv's mobile wallet technology and trade secrets, and has made efforts to conceal its misconduct. Fintiv is therefore entitled to recover double damages under O.C.G.A. § 10-1-763, and reasonable attorney's fees and costs under O.C.G.A. § 10-1-764.

156.   As described more fully herein, by stealing and misappropriating Fintiv's mobile wallet technology and trade secrets to create and launch Apple Pay, Apple has unjustly received the benefit of FinTiv's substantial time and investment in the development of its mobile wallet technology and trade secrets.

157.   Apple has avoided the expense and effort necessary to independently develop a mobile wallet through its scheme.

158.   Apple has also been unjustly enriched by its unearned credibility with new and existing customers, which would have been directed to Fintiv but for Apple's concealment of Fintiv's role in developing Apple Pay.

159.   As described more fully herein, at all times, Apple knew, appreciated, and intended to be enriched by its misconduct and has subsequently accepted and retained all of the benefits generated by its misconduct.

160.   Apple's misconduct and unjust enrichment has no justification in law or fact.

161.  As a direct and proximate result of Apple's wrongful conduct, as described more fully herein, Fintiv has sustained substantial monetary damages, in an amount to be determined at trial.

## JURY DEMAND

162.  Fintiv demands a trial by jury.

## PRAYER FOR RELIEF

On the First and Second Claims for Relief:

1. For indirect, economic, consequential, and compensatory damages in an amount to be determined according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c); and O.C.G.A. § 16-14-6(c).

2. For prejudgment interest according to statute; and

3. For reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c); and O.C.G.A. § 16-14-6(c).

On the Third and Fourth Claims for Relief:

1. Granting Fintiv reasonable royalties, in an amount to be determined at trial, for any software, technology or device sold by Apple that copies or is otherwise based on any features, functions, trade secrets, technology, or other proprietary information that was misappropriated from Fintiv.

2. Granting Fintiv indirect, economic, consequential, and compensatory damages in an amount to be determined according to proof at trial.

3. Granting Fintiv punitive and exemplary damages in an amount to be determined at trial.

4. For prejudgment interest according to statute; and

5. For reasonable attorneys' fees and costs.

Dated: August 6, 2025                    RESPECTFULLY SUBMITTED,


By: */s/ Paul G. Williams*

     Marc E. Kasowitz
     Mkasowitz@kasowitz.com
     (*Pro Hac Vice* Application To Be
     Submitted)
     Ronald R. Rossi
     Rrossi@kasowitz.com
     (*Pro Hac Vice* Application To Be
     Submitted)
     Haylei A. John
     (*Pro Hac Vice* Application To Be
     Submitted)

     **KASOWITZ LLP**
     1633 Broadway
     New York, NY 10019
     Telephone: (212) 506-1700
     Facsimile: (212) 506-1800

     Jonathan K. Waldrop (GA Bar No.
     731103)
     jwaldrop@kasowitz.com
     Marcus A. Barber (GA Bar No. 288188)
     mbarber@kasowitz.com
     John W. Downing (CA Bar No. 252850)
     (*Pro Hac Vice* Application To Be
     Submitted)
     jdowning@kasowitz.com

Heather S. Kim (CA Bar No. 277686)
hkim@kasowitz.com
(*Pro Hac Vice* Application To Be
Submitted)

**KASOWITZ LLP**
101 California Street, Suite 3950
San Francisco, California 94111
Telephone: (650) 453-5170
Facsimile: (650) 453-5171

Paul G. Williams (GA Bar No. 764925)
pwilliams@kasowitz.com
KASOWITZ LLP
1230 Peachtree Street, N.E., Suite 2445
Atlanta, GA 30309
Telephone: (404) 260-6080
Facsimile: (404) 260-6081

**ATTORNEYS FOR PLAINTIFF**